May it please the Court, I'm Mark Silversmith for Petitioner Appellant Joseph Diggs, and I would like to reserve a couple minutes for rebuttal. I'll try and watch the clock. If there's a case that merits this Court's writ under the AEDPA standards, this is the case. Mr. Diggs is asserted his innocence throughout these 13 years. The case against him is weak, and yet there are two constitutional errors which the state courts themselves have acknowledged. Two errors which are either concededly or plainly prejudicial to this concededly weak case. It doesn't violate the right of comedy that is encapsulated in the AEDPA to uphold the state court finding a Bruton error in juror misconduct. It doesn't violate comedy to find prejudice where the state courts never ruled on the prejudice issue for the Bruton violation, or where the state court used the wrong standard of prejudice for the juror misconduct issue. This Court could easily write an opinion granting the writ on either issue, which only relies upon state courts' finding of constitutional error and concessions by the state or the state courts as to the prejudicial effect of those errors, and write the entire opinion without contradicting any finding or reasoned opinion on an issue of law by a state court in this case. Well, basically, we've got to take kind of an independent look at the Bruton issue. Yes, Your Honor. But let me ask you, just focusing in on that question, why is there any Bruton error to begin with? Because the statements don't implicate Diggs. If you link up the statements with the other evidence, then it's obvious that the two were telling inconsistent stories, but that was obvious without the references in Fain's statement to Diggs and vice versa. So even at most, the inculpatory effect is pretty mild. So what's your response? Well, I think you have to look at Cruz v. New York, where Justice Scalia wrote for the court and said, we're excluding the entire class of statements where a defendant names a co-defendant. And you have to look at the fact, and he said, even if there's a... See, the problem here, I'm just trying to get right to the heart of it, the problem here is that the statement doesn't name him. I mean, sure, it says, we traveled together, but there was no dispute about that. Well, it does. It does name him. It says his name in the taped statement, which the... It doesn't say, he did it, I didn't. No. Okay. So you back off from that, and at most, what it does, I'm just suggesting, is to show that the two of them were telling inconsistent stories about what happened once they got off the bus. But that was obvious anyway. Well, it's partially obvious, but the main focus that I state in my reply brief is, is Wanda Fain is the albatross around Mr. Diggs' neck. She's the one who's supplying Robin Williams with cocaine. She's the one who gave her the note to begin with, the threatening note. She's the one who's got the relationship with Greg Brown, who has the motive to harm Robin Williams. And she's the one in her taped statement, which comes in at the end, says, he was with me the whole time. Now, Mr. Diggs had his statement that was brought into trial, says, no, I went into the Taco Bell. I went to Kentucky Fried Chicken. They went to Taco Bell. I went to get my beer, and I came back, and they were gone. So there's a very significant portion of time when he doesn't know what Wanda is doing with Robin Williams. She's the one that, when Robin Williams wakes up, she says, I think Wanda might have done this to me. And then Levin questions her further, well, who were you with earlier that evening? And then she mentions Lemuel, which, I'm sorry, Samuel. Mr. Diggs' middle name is Lemuel. So she had that wrong. She barely knows Mr. Diggs. She had no interaction with him. Wanda's statement that went in over the defense objection was to make it impossible for Mr. Diggs to separate himself from Ms. Fane. And what the court said in Cruzford – Williams had done that. I mean, Williams said, I was walking down the street laughing and then I saw that Mr. Diggs was right behind. So Samuel was right behind. Well, she didn't know that. She didn't look there, Judge. The jury could believe it. That's what she said. And the jury bought it. The jury could believe it, but we had substantial evidence that her memory was unreliable. Which the jury could discount. The jury could discount that. But the fact of the matter is, if Fane says, I'm with him the whole time, it makes it more likely that they're going to believe that he was with Wanda behind her than his statement, which is, I was in the Taco Bell and they were gone. That's the key issue. There's not a lot of evidence against Mr. Diggs. You have to grant me that. And this is a very substantial portion of evidence that links the two together and makes it impossible for him to distance himself from her. And that's what Justice Scalia said in Cruz v. New York. Even if they're interlocking confessions and they go hand in hand, it still makes it more difficult for Diggs to separate himself from that. I'd like to turn to the jury misconduct by having the bus schedule considered and used. Yes. Well, the Court of Appeals said, as the Attorney General concedes and as the trial court found, this was juror misconduct, for the at least one juror to use the bus schedule to help fill in the timeline of events on the evening of February 7th, 1995. And that's what the jurors said they did. There was a So what difference does it make? Because the timing was never an issue. I mean, it wasn't an issue at all in trial. They got They said when they got on the bus. They said when the bus got there. Nobody disputed that. No, it was I beg to differ, Your Honor. Okay. That's why I'm asking. Okay. Well, first of all, what our testimony showed in the defense case was that she was likely to have a half an hour gap in her memory. She said a lot of my memory got erased that evening. And what Mr. Ott from the Attorney General's office said and what the district court said is the question is whether they were with her in the time she was walking or whether she had confabulated some events from earlier in that evening and then erased the 30 minutes. But the bus schedules filled in that gap. It's an hour and 20 minutes. How did they do that? Yeah. The jurors said that they did that. That's irrelevant. As a matter of looking back on it objectively, I think the question is how could the schedules have had any effect at all? Because it wasn't an issue. It was an issue. The question is were they there at the time that she got shot? Now, there's two schedules that are being reviewed. There's the Shelton schedule, the number 13 bus that shows how frequently those buses come by. So it tells you how long she was laying there in the street. There's also the schedule from the number 15 bus which Fane, Williams and Diggs were on which tells you how frequently. It tells you how long it takes to get there. They fill in the gaps as to whether this was a long bus ride, whether it was a short bus ride, how frequently the buses come and how frequently the other bus comes to see them. That was the only issue in the case. That's what the state said in their brief. I mean, was that ever mentioned? Ever? I mean, there was no that's the thing I don't understand. I mean, there was agreement about when they left home and about how long the bus ride took. And then they split as to what happened after that. But the bus ride itself, everybody agrees occurred about when it happened, maybe within a minute or two off. It's not a question where in a lot of murder trials, sure, the time of death just is incredibly important. But was there any testimony here about when she died at the time of death from an expert or anything like that? No, she didn't die. I'm sorry, about when she was shot? Well, no, but there is a time when the bus driver called in exactly when he found her. And we don't know when she was shot. And we know from Williams and Fane, who were high on cocaine, that they believe it was around 7.15 or 7.30 that they left. But the bus schedules are what the jury felt it was necessary to consult to fill in that timeline. We didn't argue about the bus schedules, obviously, at trial, because we didn't find out about that until afterwards. And we did a Well, I suppose if it had been important, somebody could have thought to look. Somebody could have. But the other thing is that MUNI in San Francisco is notoriously unreliable. So if I'm going to be proving when the buses were, I wouldn't be using the bus schedules. I'd be bringing in the drivers of that route to show when they were going. But, you know, I'm supposed to rebut the people's evidence. And I'm supposed to rebut the evidence that is being brought in by the parties. The people didn't bring in that evidence to fill in the timeline. The jury thought it was important. And they consulted it. And they used it. I mean, nobody disputes that. I mean, if this was a strong case, maybe you could say it was not prejudicial. But the people and the district court haven't come up with any cases where this kind of evidence was found not to be prejudicial. I mean, it was an issue. They say timing, the time when she got shot, and where they were with her at that time is an issue in the case. I mean, you just take that and you put that on with the finding of Juror Misconduct and there's your opinion granting the writ. And my time is up, if I may have a moment. Let's hear from Mr. Ott. Good morning. And please, the Court, Gregory Ott for Respondent. One quick comment. I heard a reference to two conceded errors. The only error we ever conceded was that there was misconduct. I don't think it was disputed that the best schedules were present. And that's the end of that. The Bruton cases all talk about facial incrimination. They don't speak to mere mention of a co-defendant. In some of the cases, there was no mere mention, but the language of the holdings of Bruton, Richardson, I believe Gray, also spoke to facial incrimination. Now, this Court's decision in Anglin, which was a direct appeal, and the First Circuit's decision in Brown are very similar. In those cases, there was, you might say, a mere mention, but exculpatory mention of the co-defendant. Now, if we take away the statement of Wanda that they were together the whole time, tell me exactly what the evidence is left about Diggs. If we take away Wanda's statement to police that Diggs was there? That Diggs was with her the whole time. We have Diggs' statement that he was there with Ms. Williams. And he rode the bus, got on the bus with her. He doesn't, well, let me first talk about the redacted version. In the redacted version, Diggs says, I got on the bus with Williams, rode it to the same stop. I don't think he was asked about timing, but he says he gets on the bus. So he places himself there, just in the same place. We know he rode the bus and he got there. What else do we know? He says that when he got off the bus stop, that was the last he saw of Williams. And that's what Fain's statement says, essentially, as well. Did anybody else except Wanda put him there after they got off the bus? Not at the scene where she is found shot, but Fain's statement didn't put him there either. Fain's statement was an alibi, says, I didn't see Williams after that bus stop either. Williams says, Williams is the only one who says, they both walked with me down I believe it was Gerald Avenue. Williams is the one who puts them both there. Neither Fain nor Diggs placed the other with Williams at the site of the shooting. This is an odd case, because there really isn't much evidence, except these were people that rode the bus with her, and according to her, followed her along. Well, there's a history in which Diggs is admittedly the lesser participant on this cold record. But he's there at virtually every step. He lived in the same apartment in which Brown was arrested. That 126 Blythdale, where he lived with Fain, is the same apartment where Brown was arrested. He's there pretty much throughout the entire history. He didn't take his active role, for instance, he didn't bring the note to Fain, but he's there the whole way, and Williams puts him there the whole way, and Williams puts him right behind her when the lights go out. Diggs' version of events, and there was some reference to the issue being whether Diggs was there with her at the time. The issue isn't whether he was there at the time, it's whether he was there at all. Diggs and Fain both say the bus stop, and I cannot remember where they all got off the bus, they all agree, that was the end of our association. We didn't see Williams after that. There was no issue as to timing, whether they were there at the site of the shooting. They claim they were never there at the scene of the shooting. Williams puts them there. The purpose of their trip would have kept them together, is that right? That they were going down to do some acts of prostitution so they could get some additional dope? That's correct. That's what Williams said she was told and understood, and that Diggs was along. The only information she received, as I understand, was that he was alone for protection, because I guess this was a seedy area. And who said that he was to be alone for protection? Your Honor, I don't remember whether Williams says Fain said that, or whether Diggs said that. I can only recall that Fain said Diggs didn't say much, but that he was with them, walking with them, and then walking behind her. I would also point out that the jury did find that Diggs possessed a firearm. That was reversed on Diggs possessed a firearm. There's been a lot of talk of, well, the jury didn't find that he specifically inflicted great bodily injury, or that he personally used, but there was inexplicably, arguably, a finding that he possessed a firearm. Now, that was reversed on appeal, because there was not a stipulation, despite the trial judge's instructions to the jury. There wasn't a stipulation that he was a prior, that he was a felon. Nevertheless, I think it's a valid consideration that he was found to have possessed a firearm. The incremental difference between the statements as redacted and unredacted, I believe, is almost non-existent. There's a little inconsistency when they get off the bus, but in the scheme of things, that doesn't matter because neither of them agrees that they went down the road. As I said before, the issue is whether they were there at the scene at all, not what they did and what the timing was. Fain exculpates him, says he wasn't there, he was with me. How do we think about the fact that the real case for Diggs was that William's memory was completely faulty and unreliable, and this fact of the bus schedule would seem to give some credence and some substance that she was telling the truth? Well, there isn't any indication the bus schedule would have helped the defendant any more than the prosecution. She was impeached. There was a lot of testimony about the effects of both the gunshot and drug use. And moving on to the bus schedule, it simply wasn't ever an issue as to the time frame between them getting off the bus and the timing, whatever that was, of the shooting. It was presence. Were they there, were they not? They both claimed they weren't. She says they were. And I don't see how timing could have been relevant to that at all. And I don't think the jurors did either. There's been some argument that the jurors found it necessary to use the schedules, but that's inadmissible. What they did with those schedules is inadmissible, and if we want to get into it, there's plenty of... Well, I guess it's admissible if it was wrong for them to have the bus schedule. You'd want to know if they just said, well, we just passed it in the corner, or they did something with it. So I think that would be admissible, probably. Well, Your Honor, I can't say I know the answer for sure. I know that 606 says that... Deliberations are supposed to be out of bounds, but I think there's an exception when the problem is that they've got something they shouldn't have. Well, Your Honor, I still believe that, and I agree that they certainly can testify that it was brought in, and perhaps even to what they did with it physically, whether it was on the table for 10 minutes. But in terms of, we found this to be an issue or that to be an issue, those sort of thought processes, is what I'm saying, is not admissible. If they made a timeline... I don't know what the line is, but 606 is fairly restrictive in that regard. If the Court has no further questions, I would submit it on the briefing. Okay. Thank you very much. Thank you. Just briefly, with the Court's indulgence, the Angwin case I've looked at over and over again, and the only thing I can say about that is it relies on this Court's decision in Olano and Wright. Olano relied on this Court's decision in Wright. Wright was in 1984. That was before Cruz v. New York. That was before Richardson. It was before Gray. So I think Angwin should be considered a relic in that it's more properly understood as a harmless error case. As far as being there every step of the way, Diggs was not there every step of the way. He had only been staying with Ms. Fain for a few days. He was not there when the initial arrest of Mr. Brown took place. He was not there with the note. He had nothing to do with Brown and Fain's discussion on the night of the shooting. As far as the purpose and who said Mr. Diggs was going to come along, the testimony was that William said Wanda Fain told her Diggs would be coming along for protection, and Diggs said she, unclear if she, asked him to come along. In the discussions of the bus schedule, that is admissible evidence because what they said was we discussed that the bus schedules were brought out, which is admissible evidence, when we were discussing the time frame and the timeline. And that is not deliberations. That's talking about what's open to question that can be proven or disproven. So I think that the record is clear and I think it does the State no disservice on this record to grant the writ. Thank you very much.
judges: Fletcher, Rymer, Duffy